United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  RICHARD STEWART,                    No   C-03-4021 VRW

12           Plaintiff,                 ORDER

13

14           v

15  EDWARD J ALAMEIDA, JR, et al,

16           Defendants.
    _____/
17

18

19       Inmate Richard Stewart brings this action against

20  California corrections officials Edward J Alameida, Jr, Steven

21  Moore and J S Woodford (collectively "defendants"), asserting

22  claims under 42 USC § 1983 for violations of his rights under the

23  First and Fourteenth Amendments.  Doc #1 (Compl).  Stewart claims

24  that his validation as a gang associate has kept him in San

25  Quentin's Adjustment Center, also known as the Security Housing

26  Unit ("SHU"), in violation of his constitutional rights.

27       Although defendants initially moved to dismiss the

28  complaint pursuant to FRCP 12(b)(1) or, alternatively, for summary

United States District Court

For the Northern District of California

judgment on all claims pursuant to FRCP 56(c), Doc #11, defendants have since withdrawn their argument that the court lacks subject matter jurisdiction, Doc #25 at 2.  For reasons discussed below, defendants' motion for summary judgment is GRANTED.

I

As a consequence of being convicted for three counts of first degree murder, Stewart has been in the custody of the California Department of Corrections and Rehabilitation (CDCR) since May 1991.  At all times relevant to this case, Stewart was incarcerated at San Quentin.  Doc #12 (Cattermole Decl), Ex C, AGO-153.  All condemned prisoners[1] at San Quentin are classified by the Inmate Classification Committee ("ICC") as either "Grade A" or "Grade B."  Grade B prisoners are viewed as a threat to prison safety and are typically housed in San Quentin's Adjustment Center, also known as the Security Housing Unit ("SHU").

Based on Stewart's episodes of violence at Contra Costa County Prison prior to his transfer to San Quentin, ICC initially classified Stewart as Grade B.  Id, Ex G, AGO-258.  During his time in prison, Stewart has been found guilty of "flooding" his cell, "possession of an inmate manufactured weapon," "battery on a peace officer" and a "stabbing assault on an inmate."  Id, Ex F, AGO-188, AGO-178, AGO-180, AGO-184.  Because of these episodes Stewart has, with one documented exception, consistently been classified as Grade B and housed in the SHU.  Id, Ex D.  Stewart was briefly

---

[1] Although Stewart was initially sentenced to death, for reasons that are not clear from the record, his sentence was changed to life in prison without the possibility of parole in March 2005.  Cattermole Decl, Ex I, AGO-285.

2

United States District Court

For the Northern District of California

1    reclassified as Grade A on January 27, 1994, based on his clean

2    disciplinary record during the preceding six months.  Id, Ex G,

3    AGO-251.  Two days later Stewart was involved in a fight with

4    another inmate that led to his being found guilty of the

5    aforementioned stabbing assault charge.  Id, Ex F, AGO-184.  On

6    February 3, 1994, the ICC reclassified Stewart as Grade B.  Id, Ex

7    G, AGO-247.  Stewart has remained discipline-free since 1994, and

8    has requested reassignment to Grade A housing on multiple

9    occasions.

10            One basis for confining an inmate to the SHU is

11   "validation" as a member or associate of a prison gang.  15 Cal

12   Code Regs, tit 15, § 3341.5(c)(2)(A)(2).  Institutional Gang

13   Investigators ("IGIs") are charged with investigating inmates

14   suspected of gang affiliation.  Once an IGI believes there is

15   sufficient evidence to validate an inmate as a member or associate

16   of a prison gang, the IGI submits a gang validation package to the

17   Law Enforcement and Investigations Unit ("LEIU") for final

18   validation.

19            At a hearing before the Unit Classification Committee

20   ("UCC") in November 2001, Stewart requested that he be reclassified

21   as Grade A.  UCC denied Stewart's request and referred him to the

22   IGI "for a review and determination of his possible gang status."

23   Cattermole Decl, Ex J, AGO-214; see also id Ex G, AGO-287.  On

24   March 24, 2002, Stewart filed an inmate appeal contesting his

25   continued Grade B classification.  Id, Ex J, AGO-287.  Stewart

26   complained that he had not yet undergone IGI review despite ICC's

27   November 2001 order referring his case to the IGI.  Understanding

28   that he could not be reclassified until his possible gang

                                    3

United States District Court

For the Northern District of California

affiliation had been investigated, Stewart requested that such review be completed within thirty days.  Id.  Warden Woodford's response to Stewart's appeal stated that Stewart had been interviewed by Lieutenant Munoz regarding his gang status, although it is not clear from the record when this interview occurred or whether Lieutenant Munoz was an IGI.  See id, AGO-295.  Woodford ordered that Stewart be reviewed by the ICC upon completion of the IGI investigation.  Id.

On April 30, 2002, Assistant IGI M Francis reviewed Stewart's central file and interviewed Stewart.  Id, Ex E, AGO-164.  Although Stewart does not appear to dispute that this interview took place, Stewart maintains he was not provided sufficient notice prior to that time that he was being investigated for possible gang validation.  See Doc #21 (Opp) at 8.  According to the form CDC 128-B completed by Francis, Stewart "was interviewed regarding his gang status, and stated he is not Aryan Brotherhood and never has been."  Cattermole Decl, Ex E, AGO-164.  Following Francis's investigation, IGI Lieutenant K Brandon forwarded to LEIU a gang validation package containing ten items evidencing Stewart's gang association.  Id.  On May 31, 2002, LEIU agent D T Hawkes reviewed the gang validation package, concluded that four of the ten pieces of evidence met validation criteria and formally validated Stewart as an AB associate.  Id, AGO-165.  The four pieces of evidence that met validation criteria consisted of a confidential memorandum regarding an interview with a confidential informant who identified Stewart as an AB associate, two group photographs in which Stewart was posing with validated AB associates and a piece of outgoing inmate correspondence containing a third group photograph.  Id.

4

United States District Court

For the Northern District of California

Stewart's sworn affidavit states that "[o]n or before May 31, 2002, [he] was never informed that prison authorities were investigating and deciding whether to validate [him] as a gang member" and was never asked to "offer [his] views" as to evidence allegedly indicating his gang membership.  Opp, Ex A, ¶¶4-5.

At a hearing on June 6, 2002, ICC decided to continue Stewart's Grade B classification based on his gang validation. Cattermole Decl, Ex G, AGO-209.  Stewart refused to attend this hearing.  Id.  On July 2, 2002, Stewart filed an inmate appeal challenging his gang validation and the evidence upon which it was based.  Id, Ex J, AGO-298.  On August 30, 2002, IGI Lieutenant Brandon interviewed Stewart in connection with his appeal.  Id, AGO-300.  Stewart's second level appeal was denied by Warden Woodford on October 9, 2002.  Id, Ex J, AGO-302.  Stewart's third and final formal administrative appeal was denied by CDCR on February 25, 2003.  Id, AGO-306.

Having exhausted his administrative remedies, Stewart filed a complaint in this court, which asserts three claims. Stewart's first claim alleges that his validation as a gang associate violates his right of association under the First and Fourteenth Amendments.  Second, Stewart claims that he was not provided with sufficient notice and an opportunity to present his views in connection with his gang validation.  Third, Stewart claims that his gang validation rested upon an insufficient evidentiary basis.

//

//

//

5

**United States District Court**
For the Northern District of California

1

II

2    In reviewing a motion for summary judgment, the court

3 must determine whether genuine issues of material fact exist,

4 resolving any doubt in favor of the party opposing the motion.

5 "[S]ummary judgment will not lie if the dispute about a material

6 fact is 'genuine,' that is, if the evidence is such that a

7 reasonable jury could return a verdict for the nonmoving party."

8 Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes

9 over facts that might affect the outcome of the suit under the

10 governing law will properly preclude the entry of summary

11 judgment."  Id.  And the burden of establishing the absence of a

12 genuine issue of material fact lies with the moving party.  Celotex

13 Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is

14 granted only if the moving party is entitled to judgment as a

15 matter of law.  FRCP 56(c).

16    The nonmoving party may not simply rely on the pleadings,

17 however, but must produce significant probative evidence, by

18 affidavit or as otherwise provided in FRCP 56, supporting its claim

19 that a genuine issue of material fact exists.  TW Elec Serv v

20 Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).

21 The evidence presented by the nonmoving party "is to be believed,

22 and all justifiable inferences are to be drawn in his favor."

23 Anderson, 477 US at 255. "[T]he judge's function is not himself to

24 weigh the evidence and determine the truth of the matter but to

25 determine whether there is a genuine issue for trial."  Id at 249.

26    The evidence presented by both parties must be

27 admissible.  FRCP 56(e).  Conclusory, speculative testimony in

28 affidavits and moving papers is insufficient to raise genuine

6

issues of fact and defeat summary judgment.  Thornhill Publishing Co, Inc v GTE Corp, 594 F2d 730, 738 (9th Cir 1979).  Hearsay statements in affidavits are inadmissible.  Japan Telecom, Inc v Japan Telecom America Inc, 287 F3d 866, 875 n 1 (9th Cir 2004).

III

A

Stewart claims that by validating an individual as a gang associate solely on the basis of "simple association" with other validated gang associates, CDCR is violating Stewart's constitutionally protected right to associate freely with others. Stewart acknowledges that associational rights are not afforded the same level of protection in the prison environment as they are in free society.  Nevertheless, Stewart contends, to the extent CDCR policy permits gang validation decisions to be based solely on simple association, that policy is impermissibly vague, giving too much discretion to prison officials making gang validation decisions and too little notice to prisoners of what conduct might result in validation as a gang associate.  To be clear, Stewart is not complaining that he is less able to associate freely as a consequence of his gang validation.  Cf Westefer v Snyder, 422 F3d 570, 574-75 (7th Cir 2005) (holding that inmates have no First Amendment right to belong to a gang).  Rather, Stewart challenges CDCR's practice of validating inmates as gang associates based on their "social association with persons categorized as gang associates."  Compl ¶30.

At oral argument, counsel for Stewart clarified that his challenge is directed at Cal Code Regs, tit 15, § 3378(c)(8).

United States District Court

For the Northern District of California

Subdivision (D) provides that gang validation may be based upon "[i]ndividual or group photographs with gang connotations such as those which include insignia, symbols, or validated gang affiliates."  Subdivision (G) provides that gang validation may be based upon "[i]nformation related to the inmate/parolee's association with validated gang affiliates."

**B**

With some exceptions that do not apply here, whether a prison regulation impermissibly impinges on the constitutional rights of inmates is governed by the analysis set forth in <u>Turner v Safley</u>, 482 US 78 (1987).  The ultimate question under <u>Turner</u> is whether the regulation is "reasonably related to legitimate penological interests."  Id at 89.  The Supreme Court recently had occasion to limit <u>Turner</u> in <u>Johnson v California</u>, 125 S Ct 1141 (2005).  In <u>Johnson</u>, the Court held that prison regulations involving racial classifications should be subjected to strict scrutiny.  The Court, however, appeared to reaffirm the application of <u>Turner</u>'s reasonable relationship analysis to "rights that are inconsistent with proper incarceration," "including restrictions on freedom of association."  Id at 1149 (internal quotations omitted).  Further, the Court recently applied <u>Turner</u> to claims for alleged violations of the associational rights of inmates.  See <u>Overton v Bazzetta</u>, 539 US 126 (2003).

The allegation that CDCR's policies are vague and overbroad does not render <u>Turner</u> inapplicable.  See <u>Bahrampour v Lampert</u>, 356 F3d 969, 975 (9th Cir 2004) (implicitly rejecting plaintiff's argument "that claims of vagueness and over-breadth

8

must be considered separately from the requirement that prison regulations must be reasonably related to legitimate penological interests" (internal quotations omitted)).  Accordingly, the court is satisfied that Turner's analysis applies to Stewart's first claim.

Before considering whether the regulation is reasonably related to a valid penological interest, the Ninth Circuit has instructed that courts should first determine whether the asserted right is fundamentally inconsistent with incarceration.  "If so, this ends [the] inquiry."  Gerber v Hickman, 291 F3d 617, 620 (9th Cir 2002) (concluding that "[d]uring the period of confinement in prison, the right of intimate association * * * is necessarily abridged").  Since that time, however (and in the context of claims based on associational rights), the Supreme Court has proceeded to consider the reasonableness of a regulation without first determining whether the asserted right survives incarceration.  See Overton, 539 US at 131-32 (taking this approach and noting that the Court took a similar approach in Pell v Procunier, 417 US 817 (1974)).

Following the Supreme Court's lead, the court finds it appropriate to analyze the reasonableness of the challenged regulations without deciding whether Stewart's asserted right survived his incarceration.  That does not mean, however, that the compatibility (or lack thereof) between incarceration and the right asserted is irrelevant.  For, as the Supreme Court has made clear, "[p]erhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls."  Jones

9

United States District Court

For the Northern District of California

v North Carolina Prisoners' Labor Union, Inc, 433 US 119, 125-26 (1977); see also Overton, 539 US at 131 ("The very object of imprisonment is confinement.").

C

Turner prescribed four factors that courts should consider when determining the reasonableness of a prison regulation.  First among these is whether there is a "valid, rational connection" between the challenged regulation and the governmental interest it purports to advance.  Turner, 482 US at 89 (internal quotations omitted).  Second, courts should consider whether there are alternative means of exercising the right.  "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  Id at 90.  Finally, Turner directs attention toward the existence of "ready alternatives" that accommodate prisoners' rights at little cost to valid penological objectives.  Id.  The court considers these factors in turn.

1

The court first evaluates whether the challenged regulations bear a valid, rational connection to the penological interest they purportedly serve.  Gang validation procedures promote institutional security, "perhaps the most legitimate of penological goals," Overton, 539 US at 133, by allowing CDCR to identify and neutralize gang affiliates through sequestration or other means.

10

United States District Court

For the Northern District of California

1    Stewart concedes that insitional security is a
2  legitimate penological interest, but nonetheless contends that it
3  bears "no rational connection to the prohibition of interpersonal
4  association."  Compl 31.  This is so, according to Stewart, because
5  "in the absence of any evidence that he taken [sic] a loyalty oath
6  to the gang or has participated in illegal activities on the gang's
7  behalf," his association with members or associates of a prison
8  gang "does not establish that he poses a threat to institutional
9  security, except by the drawing of inferences from the mere fact of
10  his associations."  Id.

11    The court disagrees.  Simply put, there is a valid,
12  rational connection between institutional security and regulations
13  designed to isolate threats before their potential is realized.
14  This nexus is not destroyed by the possibility that inferences
15  might sometimes be a necessary substitute for direct evidence that
16  often will not be available until institutional security has
17  already been compromised.  Indeed, it would be somewhat irrational
18  to require evidence of illegal ─── likely violent ─── acts and still
19  expect gang validation procedures to function as an effective
20  security measure.  The court concludes that the regulations bear a
21  rational connection to the goal of institutional security.

22
23                                   2
24    Next, the court assesses "whether there are alternative
25  means of exercising the right that remain open to prison inmates."
26  Turner, 482 US at 90.  Stewart argues that no alternatives exist
27  because inmates may be validated on the basis of any form of
28  communication with gang-classified individuals.  In other words,

United States District Court

For the Northern District of California

1    Stewart argues that there are no alternative means of

2    communicating with individuals validated as gang members or

3    associates.

4            Turner is particularly instructive on this point.  There,

5    one of the challenged regulations barred correspondence between

6    inmates at different institutions within the Missouri prison

7    system.  After noting that "communication with other felons is a

8    potential spur to criminal behavior," the Court concluded that

9    alternative means of expression existed because the regulation

10   "bar[red] communication only with a limited class of other people

11   with whom prison officials [had] particular cause to be concerned

12   —— inmates within the Missouri prison system."  482 US at 92-93.

13           The regulations here do not create any consequences for

14   associating with inmates who have not been validated as gang

15   members or associates.  Accordingly, the court finds that

16   alternative means of engaging in harmless associations with inmates

17   exist.

18

19                                      3

20           Third, the court assesses "the impact accommodation of

21   the asserted constitutional right will have on guards and other

22   inmates, and on the allocation of prison resources generally."

23   Turner, 482 US at 90.  This is closely related to the fourth

24   factor, which considers the existence or absence of ready

25   alternatives capable of fully accommodating the prisoner's rights

26   without significantly compromising valid penological interests.

27   The court finds it appropriate to assess these two factors

28   together.

                                      12

1    The Supreme Court recently elaborated upon the special

2  problems posed by prison gangs:

3         Clandestine, organized, fueled by race-based
          hostility, and committed to fear and violence as a
4         means of disciplining their own members and their
          rivals, gangs seek nothing less than to control
5         prison life * * *. Murder of an inmate [or] a guard
          * * * is a common form of gang discipline and
6         control, as well as a condition for membership in
          some gangs. Testifying against, or otherwise
7         informing on, gang activities can invite one's own
          death sentence. It is worth noting in this regard
8         that for prison gang members serving life sentences,
          some without the possibility of parole, the
9         deterrent effects of ordinary criminal punishment
          may be substantially diminished.

10
Wilkinson v Austin, 125 S Ct 2384, 2396-97 (2005) (citations
11
   omitted).
12
        By limiting gang validation to individuals who have
13
   engaged in gang-related violence or other disruptive conduct, the
14
   challenge described by Justice Kennedy in the above-quoted passage
15
   would become all the more formidable. It would strip prison
16
   officials of a useful prophylactic in protecting against the
17
   security threat posed by gangs ⎯ a threat that endangers inmates
18
   and correctional officers alike. The court simply cannot ignore a
19
   massive, gang-related prison riot that recently occurred at Wayside
20
   Prison in Castaic, California, which bears testament to this truth.
21
   And as Justice Kennedy observed, gang-related violence cannot
22
   easily be deterred by *ex post* sanctions. In the prison context,
23
   then, an ounce of prevention is worth a pound of deterrence. The
24
   court has little trouble concluding that full accommodation of the
25
   right asserted by Stewart would seriously hinder the objective of
26
   institutional security and compromise the safety of inmates and
27
   correctional officers.
28

**United States District Court**

For the Northern District of California

D

In sum, the court concludes that the regulations that are the subject of Stewart's first claim bear a reasonable relation to a valid penological interest.  Summary judgment in favor of defendants on Stewart's first claim is accordingly GRANTED.

IV

Stewart's second claim alleges that he was not provided notice and an opportunity to be heard prior to his gang validation in violation of the Due Process Clause of the Fourteenth Amendment.

A

To invoke the protections of the Due Process Clause, a party must first establish that a protected liberty interest is at stake.  E g, <u>Wilkinson</u>, 125 S Ct at 2393.  The Due Process Clause does not itself create a liberty interest in being free from administrative segregation.  <u>Hewitt v Helms</u>, 459 US 460, 468 (1983); <u>Toussaint v McCarthy</u>, 801 F2d 1080, 1091-92 (9th Cir 1986) ("<u>Toussaint IV</u>").  Accordingly, any liberty interest in being free from administrative segregation must be the creation of state law. <u>Smith v Noonan</u>, 992 F2d 987, 989 (9th Cir 1993).  Liberty interests created by state law will generally be limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin v Conner</u>, 515 US 472, 484 (1995).  Technically, "<u>Sandin</u> requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the

14

prisoner's challenged action in relation to the basic conditions of life as a prisoner." <u>Jackson v Carey</u>, 353 F3d 750, 755 (9th Cir 2003). Stewart's complaint alleges that confinement in the SHU imposes "six significant hardships which are not typically endured by California prisoners" and implicates "four constitutionally protected liberty interests, which [Stewart] enjoys independently of the operation of state law." Compl ¶¶18-19. At oral argument, defendants assumed (without admitting) for purposes of their motion that confinement in the SHU implicates a liberty interest. The court will make the same assumption.

B

The quantum of process that is constitutionally due to segregated inmates depends upon whether the segregation is punitive or administrative in nature. <u>Toussaint IV</u>, 801 F2d at 1099. "California's policy of assigning suspected gang affiliates to the [SHU] is not a disciplinary measure, but an administrative strategy designed to preserve order in the prison and protect the safety of all inmates." <u>Bruce v Ylst</u>, 351 F3d 1283, 1287 (9th Cir 2003). In the case of administrative segregation,

> [p]rison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated. The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views.

<u>Toussaint IV</u>, 801 F2d at 1099. Further, the inmate must have "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." <u>Hewitt</u>, 459 US at 476. In the

15

case of administrative segregation founded upon positive gang validation, the official charged with deciding whether to transfer or retain an inmate in administrative segregation is the IGI. Toussaint IV, 926 F2d at 803; see also Madrid v Gomez, 889 F Supp 1146, 1276 (ND Cal 1995) ("[I]t is clear that the critical decisionmaker in the process is * * * the IGI."). Thus, prior to validation as a gang member, Stewart was entitled to an "informal nonadversary hearing" with an IGI. Stewart was further entitled to a similar hearing before ICC prior to its decision to retain Stewart in the SHU based on his gang validation.

    With these principles in mind, the court turns to Stewart's second claim.

1

    Stewart claims that he received neither meaningful notice of being considered for gang validation nor an opportunity to present his views.

    Documentary evidence submitted by defendants suggests that Stewart was well aware that he was being considered for gang validation. In fact, this evidence indicates he requested, more than once, that his file undergo IGI review. Cattermole Decl, Ex J, AGO-287.

    Nonetheless, Stewart states in a sworn affidavit that he "was never informed that prison authorities were investigating and deciding whether to validate [him] as a gang member" prior to May 31, 2002. Opp, Ex A ¶4. The court cannot ignore Stewart's affidavit merely because it is inconsistent with documentary evidence submitted by the moving parties, even though that evidence

16

includes unsworn statements by Stewart that contradict his affidavit.  See <u>Leslie v Grupo ICA</u>, 198 F3d 1152, 1157-59 (9th Cir 1999) (explaining situations in which the "sham affidavit" rule does not apply); see also id at 1159 ("Although we can understand the district court's disbelief of Leslie's assertions in his deposition and sworn declaration, such disbelief cannot support summary judgment.").  Accordingly, the court is constrained to find an issue of material fact regarding whether Stewart received notice of his impending gang validation prior to his interview with the IGI who recommended that he be validated.

2

Defendants contend that they are nonetheless entitled to summary judgment.  Specifically, they argue that regardless of issues of fact that may exist regarding the procedure Stewart was afforded prior to his validation, "[a] violation of procedural rights requires only a procedural correction." <u>Raditch v United States</u>, 929 F2d 478, 481 (9th Cir 1991).  Defendants point to Stewart's August 30, 2002, interview with IGI Lieutenant Brandon.  This interview was conducted in response to Stewart's appeal of his gang validation.  Cattermole Decl, Ex J, AGO-298 through AGO-301.  Stewart availed himself of this opportunity to explain to Lieutenant Brandon that "he was not a member or associate of the [AB] or any other gang" and to challenge the evidentiary basis of his validation.  Id, AGO-300.  Stewart does not dispute that this interview took place.  Moreover, Stewart's counsel admits that Lieutenant Brandon was "the same official who submitted Stewart's validation for approval to" LEIU.  Opp at 16.

17

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Still, Stewart posits that a hearing on appeal does not
2    afford adequate process "because an unvalidated inmate suspected of
3    gang association is likelier to be able to persuade an IGI of his
4    innocence than a gang-validated inmate appearing before an IGI on
5    appeal of his validation, because institutional bias inevitably
6    weighs against the overturning of prior institutional decisions."
7    Id.  Thus, Stewart apparently takes the position that due process
8    requires that his validation be set aside until he has been given
9    notice and an opportunity to be heard.  But the constitution does
10   not so require.  "A violation of procedural rights requires only a
11   procedural correction, not reinstatement of a substantive right to
12   which the claimant may not be entitled on the merits."  Raditch,
13   929 F2d at 481 (emphasis added).  Because the IGI concluded that
14   the initial deprivation was justified (a conclusion that was
15   adequately supported, see infra V), any deficiency in the pre-
16   deprivation process could be cured by adequate post-deprivation
17   process, and if post-deprivation process did not suffice to remedy
18   the violation, then Stewart is entitled to nothing more than
19   nominal damages.  See id at 482 n 5.

20   The court concludes that the post-deprivation remedy
21   cured any initial procedural defect that may have existed.  There
22   is no question that Stewart was well aware at the time he was
23   interviewed by Lieutenant Brandon that he was the subject of a gang
24   validation or that he was aware of much of the evidence upon which
25   his validation was based.  See Cattermole Decl, Ex H, AGO-280
26   through AGO-284 (confidential information disclosure forms dated
27   June 5, 2002).  At this interview Stewart had the opportunity to
28   present his views to the same IGI officer who submitted his gang

18

United States District Court

For the Northern District of California

validation package to LEIU for final review.  In other words,
Stewart had a meaningful opportunity to present his views to the
critical decisionmaker.  On this set of undisputed facts, Stewart's
hearing before Lieutenant Brandon afforded Stewart an adequate
procedural remedy.

3

    The court briefly addresses Stewart's suggestion that he
was entitled to an opportunity to present his views to LEIU agent
Hawkes who formally approved Stewart's validation.  See Opp at 14-
41.  This claim was explicitly rejected by Judge Henderson in
<u>Madrid v Gomez</u>, 889 F Supp 1146 (ND Cal 1995).  After noting that
the <u>Toussaint IV</u> court identified the IGI as the critical
decisionmaker, Judge Henderson turned to the plaintifffs' argument
that due process required an opportunity to be heard by the Special
Services Unit ("SSU"), LEIU's predecessor:

> While plaintiffs' argument has superficial appeal,
> it promotes form over substance.  Although the SSU
> agent formally validates the inmate, it is clear
> that the critical "decisionmaker" is the IGI.  * * *
> [T]he SSU plays a technically important but
> substantively nominal role in the process.  Nor are
> we persuaded that IGIs are unaware of the
> significance of their role.  Given that inmates have
> an opportunity to present their views to the IGI and
> the ICC, the failure to provide a hearing before the
> SSU officer does not violate due process.

Id at 1276.
Stewart offers no reason why the Judge Henderson's reasoning should
be jettisoned in this case.
//
//
//

19

**United States District Court**

For the Northern District of California

1                                   **4**

2          Summary judgment in favor of defendants on Stewart's

3     second claim is GRANTED.

4

5                                   **V**

6          Stewart's third claim alleges that he was validated as an

7     AB associate without an adequate evidentiary basis in violation of

8     the Due Process Clause of the Fourteenth Amendment.

9          Prison administrators are empowered "to make segregation

10    decisions on the basis of 'some evidence.'"  <u>Toussaint IV</u>, 801 F2d

11    at 1105.  The legal standard of "some evidence" was adopted by the

12    Supreme Court in <u>Superintendent v Hill</u>, 472 US 445 (1985).  Under

13    <u>Hill</u> the "relevant question is whether there is any evidence in the

14    record that could support the conclusion reached."  Id at 455-56;

15    see also <u>Bruce</u>, 351 F3d at 1287.  A "modicum" of evidence suffices.

16    <u>Hill</u>, 472 US at 455; see also <u>Cato v Rushen</u>, 824 F2d 703, 705 (9th

17    Cir 1987) (stating that the standard is "minimally stringent").  In

18    making segregation decisions, prison administrators may properly

19    rely on their "experience and awareness of general prison

20    conditions" as evidence.  <u>Toussaint IV</u>, 801 F2d at 1105.  Further,

21    "a reviewing court may not reverse the administration's decision"

22    if it is supported by some evidence.  Id.

23          Stewart was validated based on four separate pieces of

24    evidence:  (1) a confidential memorandum dated May 21, 2002,

25    documenting an interview with an inmate-informant who identified

26    Stewart as an AB associate, Doc #18 (Cattermole Sealed Decl), Ex D;

27    (2) a confidential memorandum dated March 9, 1999, containing a

28    photograph of Stewart posing with six other inmates, three of which

                                  20

United States District Court

For the Northern District of California

1  were validated AB associates, id, Exs I & J; (3) a confidential

2  memorandum dated February 10, 1994, containing a photograph of

3  Stewart posing with nine other inmates, one of which was a

4  validated AB member, two of which were validated AB associates, and

5  the balance of which (including Stewart) were suspected AB

6  associates, id, Ex L; and (4) a confidential memorandum dated

7  October 3, 1994, containing a photograph of Stewart posing with

8  three validated AB associates.

9        Stewart asserts that none of these pieces of evidence

10 bear sufficient indicia of reliability to qualify as some evidence.

11 Stewart's argument misses the mark.  First, Stewart's challenge is

12 based primarily upon standards established by CDCR regulations, not

13 the United States Constitution.  See 42 USC § 1983 (creating a

14 federal cause of action for deprivations of constitutional rights

15 and some violations of federal law); see also <u>Campbell v Burt</u>, 141

16 F3d 927, 930 (9th Cir 1998) ("As a general rule, a violation of

17 state law does not lead to liability under § 1983."); <u>Lovell ex rel</u>

18 <u>Lovell v Poway Unified Sch Dist</u>, 90 F3d 367, 371 (9th Cir 1996)

19 ("We cannot enlarge federally protected rights simply because

20 California chose to expand its state-created rights.").  Moreover,

21 the CDCR regulation cited by Stewart requires a further

22 determination of reliability only for confidential informants, not

23 physical evidence such as photographs.  See Cal Code Regs, tit 15,

24 § 3378(c)(2).  In any event, *in camera* inspection of the

25 photographs satisfied the court that they are sufficiently reliable

26 to qualify as "some evidence."

27        With regard to the one piece of evidence that was based

28 on information obtained from a confidential informant, Stewart

21

United States District Court

For the Northern District of California

1    argues that this evidence amounts to a so-called "laundry list"

2    identification because it identifies Stewart as an AB associate

3    without reference to any particular gang-related acts performed by

4    Stewart.  Stewart directs the court's attention to a settlement

5    reached in another case in this district before Judge Jenkins,

6    Castillo v Marshall, No C-94-2847-MJJ (the "Castillo settlement"),

7    of which the court takes judicial notice.  By the terms of that

8    settlement, which was executed in September 2004, the CDCR

9    defendants agreed that "confidential source[s] must identify

10   specific gang activity or conduct performed by the alleged

11   associate or member before such information can be considered as a

12   source item."  Opp, Ex E ¶21.  But even if the court were to find

13   that the confidential informant in this case did not identify

14   specific gang-related acts performed by Stewart, there is no

15   indication that the Castillo settlement was intended to apply

16   retroactively.  And because the May 22, 2002, memorandum states

17   that the confidential informant had provided reliable information

18   in the past, it satisfies the constitutional requirement for

19   reliability.  See Zimmerlee v Keeney, 831 F2d 183, 186 (9th Cir

20   1987) ("Proof that an informant previously supplied reliable

21   information is sufficient.").  And in any event, "any of the[]

22   three [photographs] would have sufficed to support [Stewart's]

23   validation because each has sufficient indicia of reliability."

24   Bruce, 351 F3d at 1288.

25        Summary judgment in favor of defendants on Stewart's

26   third claim is accordingly GRANTED.

27   //

28   //

                                   22

VI

In sum, defendants' motion for summary judgment on all claims is GRANTED.  The clerk is DIRECTED to close the file and terminate all pending motions.

SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge

23